And we have Judge Rovner back, so let's proceed with our third case, which is United States v. Gibson. Good morning. Good morning. Carrie Conner, on behalf of Mr. Gibson, I'm filling in today for Attorney Donald Swanson. Before the court, we have a challenge to a search conducted pursuant to a warrant, and the defendant has taken the position, and accurately so, that the three aspects that were relied on by the court in affirming the search warrant are part of one continuous contact, in essence, that the law enforcement had with the defendant, and require suppression as a result of both a combination of the error committed by the district court in its legal conclusions and even accepting the factual findings of the district court. Specifically, the warrant, which is actually quite simple and is found as part of the defendant's appellant's filing as their appendix, is only two pages long. It very simply relies first on an initial stop on foot by law enforcement of Mr. Gibson and his friend, Mr. Miller. In essence, the officer claimed that he found it unusual that two men would be walking down a residential street at 10 o'clock at night, and as a result, he stopped those individuals. Ultimately, Mr. Gibson ends up being... The area itself was a little questionable, wasn't it? There is an indication in the record that the officer felt that there was crime in the area and that a week earlier there had been some burglaries. So it wasn't just the fact that they're walking down a street at 10 o'clock at night. It's where and the circumstances surrounding that. Well, Your Honor, I believe even in crime-ridden neighborhoods, there should be no Fourth Amendment violation by two men simply walking down the street, one man drinking, I believe it was a Sprite or a Mountain Dew at the time. They were called over by the officer. The officer described them as cooperative. However, because the officer claimed he had some knowledge about Mr. Gibson, he actually took him to the ground and put him in handcuffs. Under all of those circumstances, Your Honor, it certainly is, particularly in this case where the two men are told to come to the front of the vehicle, it's not merely a stop on the sidewalk to chat. Not only is there forward motion interfered with, but they're actually told to come to the vehicle, ordered to come to the vehicle in a certain way. Clearly, we have a Terry stop, which becomes an arrest as soon as we have handcuffs on those individuals. Eventually, Mr. Gibson and Mr. Miller are released and they walk away to go about their business. Interestingly, the officer claims that he finds a meth pipe underneath his vehicle. At some point, it's not disputed in the contact with the officer and Mr. Gibson. Mr. Gibson either falls, because it's icy, or purposely goes to the ground. It's not clear. The officer claims he's concerned that the meth pipe was thrown toward the car at that time. However, the officer never sees anything thrown. He hears nothing. There's no furtive movement to suggest that such an event happened. Ultimately, we don't know whether that meth pipe was in the street previously. We don't know if Mr. Miller may have had it on his person and thrown it. We don't know if Mr. Gibson may have thrown it. Obviously, if that case had been tried locally, there would be insufficient evidence to prove possession of a meth pipe. However, then the same officer, Officer Harrison, communicates to the next officer to make a stop of that vehicle. Mr. Officer Hartman makes the stop of the vehicle ultimately in the driveway of Mr. Gibson's car. Mr. Gibson actually consents to the search of his car. His car is searched not once, but twice. He is held for 40 minutes in handcuffs during that time, at which point his wife comes out and tells officers incriminating statements about items in the house after becoming nervous about 40 minutes passing. The magistrate judge made certain findings and conclusions about the wife's previous cooperation with agents, with federal agents, and to the extent that the warrant was based on those statements, which were independently sufficient to sustain the finding of probable cause, the magistrate judge found they were sufficiently attenuated from anything that had happened previously to preclude suppression here. And that was not challenged before the district judge, so why are we here? The trial court, it is correct, at the trial court level, the objections that were made to the findings were very factual in nature, and in that sense, pinpointed on the initial search, Your Honor, the search in the street. However, it's quite clear that the defense counsel at that time viewed this as a continuing matter and did actually, before the magistrate, discuss the concept of attenuation. I think it's... But didn't object to the magistrate judge's findings on attenuation before the district court, so we accept that as conclusively established and unchallenged. Except Your Honor, obviously this court can look to it at least under manifest injustice, under plain error analysis, and we would ask the court at a minimum to do that, because I think it's important that we go back to the original search warrant in this case. And again, though the magistrate at the challenging level took a great deal of evidence about the DEA, about what information other law enforcement officers had at the time, the actual search warrant that was presented for signature did not include that information. In fact, the information is completely absent from that search warrant. As this court's well aware, when we look to the validity of a search warrant, we have to look to the four corners of the search warrant. The government doesn't get the benefit of then holding a hearing and saying, but we had all this more evidence, look. In this case, there was no argument of attenuation that could have been drawn from this search warrant. That was offered later. Therefore, the judge that signed off on the original search warrant did not have any of that information before him. Had, in fact, the magistrate had additional information, the court may or may not have understood the context of those statements. I would suggest to the court, however— You mean the judge that issued the warrant? Yes. Well, nothing else that happened in this encounter with local police or federal agents on the property in question vitiated the probable cause established by Krista Gibson's statements. Well, Your Honor, I do think it's an important point, though, how bare bones this search warrant is because—and I think this is important—there's no information in here upon which the judge—and I know this is not briefed in the briefings—but there's no information when we look to the She saw meth in her home. Yes, but why do we believe her? And that is a question that the signing judge would have to address. Why do we believe her? Because he— Well, he might believe her because she's been working with the DEA all along. And that is—it could go either way, Your Honor. It's possible that the magistrate would say, she's been working with the DEA, and obviously they believe that she is a credible source of information. It could go the other way because it could be not merely that this was the wife of some man being stopped on the street who has no horse in the game, but she's actually a government actor at this point. She's been cooperating with the agents for weeks, if not months. That information is not provided to the magistrate who signs off on this warrant. He is viewing her as any old wife of an individual who's being investigated, and she's not. She's actually a government actor herself. Now that issue, I admit, is not raised in these briefs. As the Court's aware, I'm standing in for oral argument. But I do think that it's something significant that should be considered because when we take out the first two stops, the first stop, which, even accepting the facts as asserted by the magistrate, certainly does not raise to the level of probable cause, the immediate second stop of the vehicle, which takes 40 minutes and is two searches, clearly is problematic when we're talking about a warrant signed at this point at 2.18 a.m. We have an individual who has been detained continuously since about 10 o'clock that evening, though he's gone from the street to his vehicle. And yet, when we look at what's presented to the magistrate for signature, what we have are those two stops and the statements of an innocent wife, supposedly. That's really not correct. And I would ask the Court, though I am raising this at the time of oral argument, to allow initial briefing on that and or to remand to the District Court for a hearing on the significance of that information being withheld. Because that is... I would like... Because time is short, I'm going to ask you something a little different. Can you hear me? I can. I'm listening. Okay. Are you or could you even challenge the legality of detaining Gibson in his driveway after this traffic stop in light of the rule that it is reasonable to detain an individual while diligently pursuing a search warrant? I do believe that that is a potential issue. I don't believe that there was any information in the record to talk about that lends light to how diligent the officers may have been. But certainly, four hours is a long time. I believe that the ticket at issue here indicated it was signed at 1039. There's some evidence in the record to suggest that it may have been filled in later at a later date, and the magistrate talks about that. But that means between 1039 and 218, Mr. Gibson was held in handcuffs in the back of the car. I can't imagine how that could possibly be a reasonable amount of time to detain. Counsel, have you saved some time for rebuttal? Yes, I will. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court. I feel like the Fourth Amendment claims have shifted somewhat throughout this case and even more so through the argument here. But the bottom line remains that there were no Fourth Amendment violations, and to the extent that the Court thought that there was one, any Fourth Amendment violation would not justify the suppression of the search warrant evidence, which is the only evidence that the defendant on appeal has expressed any concern about. Starting with the— Mr. Hartman, when did the DEA notify Officer Garrison and Deputy Hartman that Gibson was suspected of drug trafficking? Local law enforcement was not in any way already cooperating with the DEA on the investigation into Gibson, were they, or were they? They were not involved in the DEA investigation, Your Honor. There was discussion, and I believe this is in Garrison's testimony primarily, that there had been information that had been sent out to the locals that he was suspected of being a drug trafficker. There was information—that was basically the extent of the information, just something that comes up to sort of let you know that this person is being investigated. But they were not involved in the investigation. They knew nothing prior to the night of December 13th about who the cooperating informant was, which was Gibson's wife. What crime did Officer Garrison reasonably believe was being or about to be committed when he decided to put handcuffs on Gibson and frisk him? Because it doesn't seem as if there was any evidence of any criminal activity whatsoever. Well, at the time that he was investigating, at that point, I believe that what he would testify to is he was trying to figure out whether these people were attempting to commit a burglary or a theft. That was what his concern was. But as far as the Court's question goes, he asked the defendant if he could—if he was and the defendant said he was. So that's a consensual statement. As far as the handcuffing goes, the question at that point is, was there a reasonable suspicion sufficient to justify an investigative detention, to hold the defendant at the scene to investigate whether he was involved in burglary, theft, some kind of drug activity? The defendant's actions certainly were somewhat erratic, odd, fidgety, that might be suggestive of drug usage. And so the question at that point is, could he briefly detain him at the scene to figure out if any one of those activities might be going on? This was an odd situation. Did Officer Gibson handcuff Gibson's companion, Mr. Miller, as well? So after Gibson goes to the ground during this pat-down and is—I mean, Gibson claims he slipped and fell on the ice. The officer says, it looked to me like he went down intentionally. At that point, the officer became concerned for his safety, called in for backup. And while he was waiting, because he's outnumbered with two people there, he did at that point handcuff both of the men. And then the other officers show up, they question the men, and they release them. But even, Judge Rovner, if the court thought that there was a problem with the act of the handcuffing, that the Fourth Amendment violation here was the handcuffing, you know, the court said in Howard that unconstitutionally handcuffing somebody is irrelevant to a suppression issue if no evidence is found as a result. And there's no evidence that after this happened, the fact that they may have briefly handcuffed the men for what appears to not have been a particularly lengthy period of time, five or ten minutes at the most, that that in some way led to the discovery of any evidence or caused anything to happen. If defendants have any claim, Miller perhaps, it would be some kind of a Fourth Amendment claim, some kind of a civil rights suit like we've heard about earlier today. But it would not be a Fourth Amendment suppression of evidence case in Mr. Gibson's criminal trial. That would be even more the case for Mr. Miller's handcuffing. If Mr. Miller was unconstitutionally handcuffed because he was compliant while Mr. Gibson wasn't, that couldn't possibly lead to suppression of evidence from Mr. Gibson's house that was essentially from Mr. Gibson's wife's evidence. And that's of course where the... You know, I have to ask you about something in your brief because you stated in your brief that if there were a Fourth Amendment violation here, it was arguable and close to the line. You know, you use that to support your contention that suppression here is not necessary. And I'm trying to figure out what that was supposed to mean, that we wouldn't suppress evidence resulting from a Fourth Amendment violation because it was not a very bad violation of the Fourth Amendment. Oh, well, Your Honor, I mean certainly this just relates to the attenuation argument in the Utah v. Strieff case and many other cases where the court has said if it's not, you know, essentially flowing, if it's not essentially flowing through the evidence and the evidence is it was not a purposeful or flagrant violation, that's what the court has said as well. And in Strieff itself, the court said, look, they should not have... I mean, it's very similar to the facts of this case. The court shouldn't have engaged in a Terry stop of the defendant. The court should have tried to have a consensual encounter with the defendant, but it's close to the line. The circumstances were close. And under those circumstances, once the ball gets rolling, the fact that then there's this independent source, that sets it aside. I mean, I suppose it could be a situation where we would essentially say, hey, even if there was an independent source, if the government went in like they did in Mapp versus Ohio and committed a flagrant violation, we might still suppress the evidence. But that's, I think, what it goes to. At any rate, we don't think there was a Fourth Amendment violation in the first place. But the point of the matter is that whatever Fourth Amendment violations the court thinks occurred by Officer Garrison, none of that led to the evidence that essentially supported the search warrant. And that's where the probable cause comes in. And the defendant at the suppression hearing made clear he wasn't raising a Franks claim. He wasn't raising any kind of challenge to the search warrant. So for the defendant to come in now and try to ask for supplemental briefing or try to raise some kind of a Fourth Amendment claim on that, that's completely waived. That's far too late. And in fact, the attenuation argument, as we've pointed out in our brief, itself is waived because it really wasn't raised to the district court. Very specific arguments were made to the magistrate judge. And then really only the claims narrowly related to Officer Garrison were brought to the attention of the district court. And the district court said, look, I'm going to sort of just do a clear error double check because I do review this de novo and I have some ability if I see something glaring that the magistrate judge did that I disagree with. But Judge Springman, appropriately, did a quick look and said there doesn't appear to be any particular errors in the analysis of the attenuation doctrine or of the handling of Officer Hartman's actions. And so we don't see any error there. So the court wouldn't really even, I think on those grounds, need to reach these issues. That said, I would clarify for the record, we don't think that there were Fourth Amendment violations here. We think that the actions of stopping a police car on the street, getting out of the car, asking the two men to come forward, this court has said that those actions are appropriate. He spoke in a normal tone of voice. He didn't display his weapon. He was outnumbered. There were two of them and one of him. And Gibson doesn't act like he's at some kind of freeze, hands up, Terry stop, right? He walks by the police car. He buries his Mountain Dew bottle in the snow for whatever reason. He comes back. He's kind of wandering back and forth. He's kind of answering questions. He's acting like this is a consensual encounter. We're here. We're talking. I'm here because I want to talk and because I'm willing to talk to you. I'm sure he didn't want to talk to the officer, but he was willing to talk. So that's a consensual encounter. And he was violating the officer's instructions to show his hands. He was, right. He was repeatedly putting them back in his pocket, which seems to me a crucial fact for the decision to use handcuffs. Right. Eventually the officer can say, look, and this is not just a case of somebody walking down the street at night, right? He's in this area. He knows, as Judge Bauer pointed out initially, that there's been a lot of crime here. There's been three or four recent thefts of ATVs or burglaries of houses, including one just a block away. So he knows that this is an area that's subject to crime in small town Indiana. And he's driving down the street. It's a weeknight. It's 10 p.m. and it's eight degrees outside. It is not normal under those circumstances for people to be outside. Now does that fact alone allow him to just stop anybody and, you know, handcuff them and arrest them? Of course not. But does it perk up his attention to the point that it's okay for him to stop and say, what's going on here? Why are you out on the street? You're not walking a dog. One of you is wearing pajama pants and a sweatshirt, which is not appropriate for eight-degree weather. And I don't know who you are, and I know most of the people in this town, so I can't sort of say, oh, well, you know, it's the person who lives in this house, and so I'm not going to worry about it. I thought he recognized Gibson. He does recognize Gibson from his distinctive facial hair. And he knows, I know who this guy is because I've seen just reports that he's a suspected drug trafficker. And I don't know of any reason he should be in my town. Is it possible? Sure. There's possibly a reason why he should be here, but I don't know why he's here. And it's interesting that he's a suspected drug dealer, and this is a street nearby where we have thefts. So he stops, he asks some questions, and he doesn't get any good answers to his questions. The guy's behaving erratically. The guy's putting his hands in his pockets, and at that point, he can say, look, there's enough going on here that I can briefly detain you to try to figure out what's going on. And the reality is, at the end of the 10 minutes, he still doesn't really have a good answer as to what he's there or what he's doing. But the officer appropriately says, I don't have any cause to arrest you for anything. I don't have probable cause to believe you've committed a crime. So I'm going to let you go. And that's all appropriate. None of that is a violation of the Fourth Amendment. And then the only claim that's raised at all to the district court is, had it not been for this Fourth Amendment violation by Officer Garrison, which we don't see a violation in the first place, none of this other stuff would have happened. And Utah v. Streiff and the Carter case from this court and all of his other cases say, that's not the law. That's not the law to begin with. You're not even addressing the law to the district court. Even if the court were to consider this forfeited somehow or somehow consider it preserved, I think that Carter and Streiff and those other cases fully support the idea that all of the evidence from the search warrant, which was fully supported by Krista's statements, is enough. And any new argument the defendant's trying to raise now about the search warrant itself or some kind of Frank's issue is clearly waived. If the court has any further questions, I'm happy to answer them. Otherwise, I would give back my time and ask that the judgment be affirmed. Thank you. Ms. Conner. I do think it's important that we don't just accept that two men can't walk down the street and be recognized by an officer, and that requires further investigation. As the government indicated, it was very cold out that day. That Mr. Gibson was putting his hands in his pockets may very well be because he was cold. Frisking him, checking his pockets is more than adequate to determine that, in fact, he has nothing in his pockets. It is apparent from the record that Officer Garrison did, in fact, know who Mr. Gibson was and, in fact, had called, I believe, three other officers to the scene from two other not even an investigative stop. So I think it's a very unfair characterization to suggest even Officer Garrison indicates that there was more information that he had than merely there had been some burglaries a week earlier. Also, the record is quite clear and Officer Garrison does admit that when asked, Mr. Gibson very specifically told him where his car was parked, whose house they were at, and where they were walking to. So then the record does indicate that, I believe, at the supplemental trial transcript, page 21 through about 30, there's discussion, 21, 29, 30, there is discussion about Officer Hartman, who was the officer who stopped the vehicle, talking to Agent Lundy, I believe it is, and Officer Lundy is the cross-designated officer that, in fact, had more information. I don't believe we have a time for when that communication took place, but clearly Officer Lundy was communicating with the local police officers. Thank you. All right. Thank you. Our thanks to both counsel. The case is taken under advisement.